Angelo J. Calfo, WSBA #27079
Andrea D. Ostrovsky, WSBA #37749
CALFO HARRIGAN LEYH & EAKES LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104
Telephone: (206) 623-1700
Facsimile: (206) 623-8717
Email: angeloc@calfoharrigan.com
Email: andreao@calfoharrigan.com

Chester D. Gilmore, AK ID #0405015
CASHION GILMORE LLC
421 W. 1st Ave., Suite 247
Anchorage, AK 99501
Telephone: (907) 222-7934
Facsimile: (907) 222-7938
Email: chester@cashiongilmore.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

| | |
|---|---|
| KIKIKTAGRUK INUPIAT CORPORATION ("KIC") and KIC DEVELOPMENT ("KICD"),<br><br>Plaintiffs,<br><br>v.<br><br>WALTON INVESCO, INC.; ERNEST C. TREFZ, as Executor of the Estate of Walter Baum; ANTHONY ACRI; and CHRISTINE HAYES,<br><br>Defendants. | NO. 3AN-13-6775 CI<br><br>COMPLAINT |

## I. SUMMARY OF COMPLAINT

This is a civil action brought by Kikiktagrut Inupiat Corporation ("KIC") and its majority-owned subsidiary KIC Development LLC ("KICD") to recover money damages from a group of unscrupulous business people who abused their relationship with KIC and KICD to enrich themselves. Defendants Anthony Acri and Walter Baum, acting personally and as owners and principals of their closely-held company, Walton Invesco Inc. ("WII"), concocted a scheme to gain control of KICD, and then used

KICD to siphon opportunities and benefits to their other business interests. Acri, Baum, WII, and their co-conspirator Christine Hayes, are collectively referred to as the "Walton Parties." The Walton Parties' scheme included obtaining negative control over KICD through a series of loan agreements, engaging in related-party transactions, bribing government officials, and misappropriating KICD's money for themselves. Having breached their contractual and fiduciary duties to KIC and KICD, and having committed other common law and statutory violations, the Walton Parties are liable to KIC and KICD for the lost funds and opportunities totaling at least $3,000,000.

## II.    JURISDICTION AND VENUE

1.    Jurisdiction is proper under AS 22.10.020.

2.    Venue is proper under Alaska Rule of Civil Procedure 3(e).

3.    WII has also consented to venue in Anchorage, Alaska.

## III.    PARTIES

4.    Plaintiff Kikiktagruk Inupiat Corporation ("KIC") was founded in 1973 as an Alaska Native Corporation ("ANC") pursuant to the Alaska Native Claims Settlement Act. KIC is the village corporation for Kotzebue, Alaska.

5.    Plaintiff KICD is a limited liability company organized under the laws of the State of Alaska. Its principal offices are in Kotzebue, Alaska. KICD also has offices in Anchorage, Alaska, and Arlington, Virginia.

6.    KICD is 51% majority owned by KIC and 49% owned by Defendant Walton Invesco, Inc. ("WII").

7.    Defendant WII is owned by three individuals: Defendant Anthony Acri (49%), Walter Baum (49%), and Nancy Hill (2%).

8.    Defendant Anthony Acri is a WII owner and principal and served as the CEO of KICD pursuant to the Management Services Agreement ("MSA"). He is a resident of the State of Connecticut.

9.    Defendant Ernest C. Trefz is the duly appointed fiduciary of the estate of Walter Baum. Walter Baum was an owner and President of WII. He was a resident of the State of Connecticut. Baum died on April 16, 2012. Notice of this claim has been presented to Mr. Trefz.

10. Defendant Christine Hayes was an employee and Vice President of KICD at all times relevant to the allegations in this complaint. On information and belief, she is a resident of the Commonwealth of Virginia.

11. Acri, Baum, Hayes, and WII are collectively referred to as the "Walton Parties."

## IV. KIC DISCOVERS THE WALTON PARTIES' FRAUD AND SELF-DEALING

### A. KICD's Status as an SBA 8(a) Business

12. KIC operates a diverse portfolio of companies across North America, offering quality services and products to clients in both the public and private sectors. KIC has a number of subsidiaries that are qualified as Small Business Administration ("SBA") 8(a) businesses, including KICD.

13. The SBA's 8(a) Business Development Program offers assistance to firms that are owned and controlled at least 51% by socially and economically disadvantaged individuals. Participants can receive sole-source government contracts and are able to form joint ventures and teams to bid on contracts.

14. KICD provides comprehensive management and other services, with capabilities in facilities maintenance support, design/build construction, and hazardous materials assessment services.

15. As an ANC, KIC and its majority-owned subsidiaries enjoy unique contracting advantages as a result of their minority-owned, disadvantaged business status.

16. In 2005, KIC established KICD as a wholly-owned and member-managed subsidiary.

17. KIC's attorney, William A. Walker, introduced KIC to Anthony Acri and Walter Baum, who appeared to be sophisticated business people knowledgeable about 8(a) contracting.

18. In December 2005, Acri and Baum's company WII purchased a 49% interest in KICD.

19. On December 26, 2005, KIC and WII entered into a First Amended Operating Agreement of KIC Development ("Operating Agreement"). A copy of the Operating Agreement is attached to this Complaint as Exhibit A.

20. At that time, WII also agreed to furnish KICD with employee services, including a CEO. To that end, KIC and WII agreed to a Management Services Agreement ("MSA"), which also established Acri as KICD's CEO. A copy of the MSA is attached hereto as Exhibit B.

21. The MSA imposed a number of important obligations on WII and Acri, including fiduciary obligations and compliance with the SBA and federal procurement laws.

**B.    Small Business Administration Review Reveals Improprieties**

22. In the spring of 2011, the SBA conducted its annual update review of KICD and experienced great difficulty obtaining voluntary and complete information from KICD management.

23. On or about May 6, 2011, KIC representatives met with Mr. Greg Kolean of the Small Business Administration ("SBA"). Kolean expressed concern about the activities of Acri and Christine Hayes, another KICD officer. He informed KIC representatives that KICD management failed to give full and complete responses to his requests for information.

24. Kolean also expressed concerns about KICD's compliance with SBA regulations based on the incomplete and potentially inaccurate reporting by current KICD management and based on the amount of benefits flowing from KICD to non-disadvantaged parties including Acri, Hayes, WII and their affiliates.

25. KIC directed Acri to provide complete and accurate responses to Kolean's requests.

26. The SBA launched an eligibility review of KICD, the purpose of which was to confirm that KICD remained eligible to participate in the SBA's 8(a) Business Development program.

27. In an attempt to hide their wrongdoing, Acri and others provided false and misleading information to the SBA, including false and misleading information regarding his compensation and his related-party business interests.

**C.    KIC Commences its Own Audit of KICD**

28. Parallel to the SBA review, KIC's auditors engaged in an annual audit of KICD. KIC also conducted its own investigation and review of KICD.

29. That audit and investigation illuminated additional self-dealing by the Walton Parties.

30. Further investigation has revealed that the Walton Parties and their co-conspirators were engaged in a widespread pattern of self-dealing and fraud, and had used KICD to siphon assets and opportunities to themselves.

**D.  KIC Removes Acri and WII from KICD's Management; the Walton Parties Respond by Destroying and Removing KICD Property**

31.  On July 1, 2011, KIC held meetings of the KICD Management Committee and of KICD's Members.

32.  WII, represented by principals Baum and Acri, attended the meeting.

33.  At the meeting, Baum and Acri demanded more control of KICD and additional compensation from KICD.

34.  KIC refused to meet WII, Baum, and Acri's demands, and passed resolutions taking control of KICD, removing WII from management, and terminating Acri as CEO and President.  KIC installed Larry Daniels as interim CEO and President of KICD.

35.  That same day, Daniels traveled with KIC's CEO Cole Schaeffer to KICD's offices in Arlington, Virginia, to assume control of the premises and commence day-to-day operations of KICD.

36.  KICD employees, including Acri, refused Schaeffer and Daniels access.

37.  Despite extensive efforts to obtain access, the Walton Parties prohibited Schaeffer and Daniels from obtaining control over the KICD premises for eight days, during which time the Walton Parties destroyed and/or removed KICD property, including computer hardware, computer data, and documents.

**E.  SBA Issues Notices of Suspension**

38.  On Friday, July 22, 2011, the SBA issued a Notice of Suspension to: KICD, WII, Acri, Baum, and KICD's two joint ventures—V.E.T.S., LLC and VCI/KICD LLC—suspending them from conducting business with the Government as agent or representative of other contractors.

39.  Among other things, the Notice of Suspension states that:

• Acri used KICD to engage in multiple self-dealing financial arrangements among himself, Baum, WII, and KICD.

• Acri and WII concealed information required to be reported to SBA, including all of the payments to Acri and his company.

• Acri caused KICD to enter into consulting and service agreements, the cost of which was approximately $1.4 million for the two-year period between April 2009 and March 2011.

• Acri had consistently reported to SBA that KICD had no such agreements.

- Acri and Baum, through themselves or through WII and KICD, committed falsification of records and made false statements in reporting information relevant to KICD's continued eligibility for the 8(a) Business Development program.

- Acri and Baum, through themselves or through WII and KICD, committed offenses indicating a lack of business integrity or business honesty so as to affect their present responsibility to be Government contractors or subcontractors.

40.     On July 18, 2011, Baum sent Cole Schaeffer a letter noticing WII's intent to withdraw from KICD effective six (6) months from that date.

41.     On July 28, the SBA issued a Letter of Intent to Terminate KICD from the 8(a) program.

42.     On September 16, 2011, KIC notified the Walton Parties that due to their pattern of self-dealing, they were in Default in accordance with Article X of the First Amended Operating Agreement of KIC Development, LLC.

## V.     WALTON PARTIES' FRAUD AND SELF-DEALING

43.     KIC has identified several categories of self-dealing and fraudulent conduct by the Walton Parties during the period that the Walton Parties controlled KICD.

**A.     Related-Party Transactions**

44.     The Walton Parties intentionally caused KICD to engage in a series of related-party transactions between and among entities owned and controlled by the Walton Parties and their co-conspirators for the Walton Parties' and the co-conspirators' own benefit. A common theme to most, if not all of these transactions, is that they had their inception in 2009 or 2010 and did not begin to have a material financial effect on KICD until 2010. They were also largely hidden from KIC, were entered into without notice to or approval by KIC, were in direct violation of the internal controls that had been established for KICD, and were actively concealed by the Walton Parties.

45.     These transactions provided little to no benefit to KICD, and therefore little to no benefit to KIC.

46.     Among others, the Walton Parties caused KICD to engage in the following related-party transactions:

a.     The Walton Parties caused KICD to make over $6 million in payments to ACE Construction and RECA Construction, which on information and belief are

closely tied to the Walton Parties and owned and controlled by Acri and Hayes. In addition to directing KICD resources and subcontracts to these entities, Acri allowed them to use and operate out of the KICD offices in Arlington, Virginia and the premises he leased to KICD in El Paso, TX, without charge. KICD also paid the wages of certain ACE/RECA employees. KICD did not receive equivalent value for the amounts paid to or on behalf of RECA and ACE.

b.   The Walton Parties caused KICD to engage in a number of undisclosed transactions with 3i / Exact Concrete ("Exact"), a company owned and managed by Hayes and Acri. These undisclosed transactions included a $400,000 loan by KICD to Exact, despite Exact having a very low credit rating; the loan remains largely unpaid. They also include orchestrating a scheme to use KICD to bid on a contract for which Exact prepared the bid and was to perform, to the financial detriment of KICD, who has been saddled with the cost for over $700,000 in cost overruns.

c.   The Walton Parties caused KICD to make substantial payments to Tesla Energy and 11 Global Dimensions, also both owned by Hayes. In addition, the Walton Parties caused KICD to pay the salary of "Julia Priest" (aka "Manli Priest") who is Tesla Energy's "CFO" and who the Walton Parties also caused to be a signatory on KICD's bank accounts – all without notice to or approval by KIC.

d.   The Walton Parties caused KICD to advance funds to Helix Enterprises, Inc., a KICD subcontractor who, at the time, owed Acri money. That advance to Helix remains unpaid.

e.   The Walton Parties also caused KICD to advance funds to or paid expenses on behalf of GTherm, a business partner of Tesla Energy, with whom KICD had no business relationship and from whom KICD received no benefit. The debt remains unpaid.

COMPLAINT - 7

f. The Walton Parties also caused KICD to enroll non-employees and ineligible family members to KICD's payroll and benefits plans.

47. In addition, KICD's two joint ventures—V.E.T.S., LLC and VCI/KICD LLC—paid substantial sums to related parties without notifying or seeking approval of KIC or the KICD Management Committee. More specifically, V.E.T.S. LLC and VCI/KICD paid substantial sums to: Tesla Energy, Hayes, ACE Construction, ADATech, Earl Hall, RECA Construction, WII, Acri, and Baum.

48. In addition, in 2010, KICD made numerous loans to V.E.T.S., LLC, VCI-KICD, and VCI with no authority or approval from KIC or KICD's Management Committee. The loans did not pay interest and have not been paid back in their entirety.

49. These related-party transactions either did not benefit KICD or provided KICD with less than equivalent value for the amounts paid.

50. It is likely that discovery will reveal further related-party transactions that were initiated by the Walton Parties for their own benefit and that provided KICD with little to no benefit.

**B.     Unnecessary Bonding Arrangement**

51. The Walton Parties further defrauded KIC and KICD by causing KICD to obtain an unnecessary $75 million bond that served little purpose other than to direct hundreds of thousands of dollars away from KICD, and ultimately KIC, and to themselves.

52. Shortly after Schaeffer took over as interim CEO in August 2010, Acri and Baum approached Schaeffer about expanding the bonding capacity of KICD for construction projects.

53. Acri and Baum falsely represented that expanding the bonding capacity of KICD was necessary for the continued growth of KICD and that to obtain that bonding, additional collateral would be required. Acri and Baum offered to supply the collateral.

54. At no time did Acri or Baum (1) state that their collateral would be subject to withdrawal if it was being used to support bonds, (2) warn KIC that they might withdraw their collateral and leave KIC responsible for the bond, or (3) mention any interest or other payments related to the collateral.

55.     Acri and Baum did not disclose to KIC that they really intended the accounts to be disguised loans, nor that, as such, the accounts violated certain restrictions the SBA had imposed in 2006 on WII regarding loans to KICD.

56.     Acri and Baum did not disclose that they intended to use the bond to back projects bid by V.E.T.S. and VCI/KICD.

57.     At no time did Acri or Baum reveal that they had significant commercial and financial arrangements with KICD's joint venture partner, VCI, nor did they reveal that by having KICD absorb a greater share of the bonding commitment, their exposure through VCI would be diminished.

58.     KIC relied on Acri and Baum's representations and omissions.

59.     Despite their responsibility for ensuring KICD's SBA compliance, the Walton Parties recklessly or willfully ignored the SBA's admonition that WII not obtain "negative control" over KICD.

60.     On November 1, 2010, Acri and Baum each entered into Collateralization Agreements with KICD in which KICD promised to pay them 7% per annum on $2.5 million collateral. Acri signed both of the Collateralization Agreements on behalf of KICD.

61.     KIC and the KICD Management Committee were not aware of or ever asked to approve the Collateralization Agreements.

62.     The Walton Parties directed that KICD improperly treat the collateral as loans.

63.     Based on the representations of the Walton Parties, KIC agreed to be responsible for the bond.

64.     Between November 2010 and June 2011, KICD paid Baum and Acri each $116,666 in interest payments on the collateral.

65.     In addition, because the collateralization accounts were in KICD's name and used KICD's Tax ID number, the gains due to appreciation in the account and the sales of securities were attributable to KICD for tax purposes. Thus, Acri and Baum were able to shift their tax obligations for 2010 onto KICD. Acri was also able to avoid tax liability for roughly $278,000 in gains that he withdrew from the account in 2011, while leaving KICD liable for the taxes.

66. KICD never needed the level of bonding and associated collateral that Baum and Acri represented to KIC as necessary.

67. Acri and Baum knowingly deceived KIC regarding the purported need for additional bonding capacity for KICD.

68. The Walton Parties caused the bond to be used to back VCI/KICD and V.E.T.S. projects, without any charge to VCI.

69. Unbeknownst to KIC or the KIC Members of the KICD Management Committee, Acri and Baum set up the exact same type of bond collateral arrangement with V.E.T.S. LLC for $3 million each, collecting a collateral fee of 9% APR monthly.

70. In or about July 2011, Acri and Baum withdrew their respective $2.5 million from the collateralization accounts, leaving KIC responsible for the bond.

## C. Criminal Manipulation of Government Contracting Process

71. In a scheme to defraud both KIC and the United States Government, the Walton Parties used KICD to bribe government officials in an effort to improperly profit from inflated government contracts.

72. KIC has uncovered evidence that the Walton Parties orchestrated this scheme as part of the OMA Flagship Project at Fort Bliss, in El Paso, TX. Discovery may reveal further examples of similar wrongdoing.

73. The Walton Parties intentionally conspired with U.S. Army Corps of Engineers ("COE") Project Engineer James Tuskan and ACE/RECA President Earl Hall to defraud the U.S. government and KIC of profits from inflated government contracts.

74. Tuskan's role in the scheme was to manipulate and inflate the Independent Government Estimate ("IGE") for the project. He would then transmit this confidential government document to the Walton Parties prior to KICD submitting its proposal for the government contract. He also ensured that he was on the COE Selection Board for the OMA Flagship Project.

75. The Walton Parties' role in the scheme was to use KICD to bid the contract at the inflated price, subcontract the work to their affiliated companies (ACE and RECA), and then direct ACE

and RECA to subcontract the work again for a fraction of the price, with ACE, RECA, and their beneficiaries, including the Walton Parties, keeping all of the ill-gained profits, despite having added little to no value to the project.

76. To compensate Tuskan for his essential role in this scheme, the Walton Parties, through KICD, paid Tuskan cash, by "reimbursing expenses" and entered into a "consulting agreement" with his company "Omni International" that paid him tens of thousands of dollars. On information and belief, Tuskan did not provide any legitimate consulting services to KICD.

77. The Walton Parties and their co-conspirators knew or should have known that the IGE was confidential and not to be shared with government contractors.

78. The Walton Parties were aware that Tuskan inflated the government estimate for their benefit.

79. KICD, under the control of the Walton Parties and their co-conspirators, prepared and submitted a bid on the OMA Project, a fixed price 8(a) contract, using information from the confidential IGEs forwarded by Tuskan and knowing that Tuskan had already rigged the estimate in their favor.

80. On September 29, 2009, KICD was awarded the fixed price contract.

81. No one ever notified KIC or the KICD Management Committee that KICD was compensating Tuskan, an Army Corp of Engineers employee, for business development services.

## CLAIM FOR RELIEF I

### (WII's Breach of First Amended Operating Agreement)

82. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

83. The First Amended Operating Agreement ("Operating Agreement") establishes certain fiduciary duties, including fiduciary duties of the members, officers or directors of the members, and officers and project managers of KICD.

84. More specifically, the Operating Agreement provides:

> Notwithstanding AS 10.50.130 but as may be modified by this Agreement, each Member shall have fiduciary duties to the other Members, to the MC,

and to the Company similar to the fiduciary duties of members of a joint venture, in addition to any fiduciary duties it may have as a member of the MC.

No member, member of the MC, of affiliate or officer or director of a Member or affiliate or officer of the Company shall exploit from the Company or appropriate to itself any potential work, project or business opportunity within the scope of services described as business of the Company at Article I, Section 4 above, without first notifying the MC within a reasonable time in writing of all material facts pertaining to the potential project or business opportunity, without first offering any and all reasonable assistance to the Company as would enable the Company to pursue or assume such potential work, project or business opportunity and without first obtaining from the MC approval to pursue that potential project or business opportunity in place of the Company.

Operating Agreement Sections VII.3 & XII.2.

85. WII breached the Operating Agreement by, among other things, causing KICD to (1) engage in related-party transactions that were fraudulent and/or not for equivalent value; (2) enter into or undertake other transactions and transfers that were unrelated to KICD's business, and/or did not provide reasonable value to KICD; and (3) enter into joint ventures or other business arrangements with related third parties without the knowledge and consent of KIC or the KICD Management Committee.

86. WII's breaches of the Operating Agreement have denied KIC the benefit of the agreement and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

## CLAIM FOR RELIEF II

### (WII's Breach of Management Services Agreement)

87. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

88. Like the First Amended Operating Agreement, the MSA imposes fiduciary duties on the KICD officers. The MSA specifically states that although Acri may engage in "other activities," his duties as KICD CEO must remain his "first priority" and that:

All outside activities must be subordinated to his duties to KICD, and in the event of a conflict, KICD must receive first priority. WII will report to KICD regarding other commercial activities it assigns to the KICD CEO and other commercial activities in which the CEO is engaged. The CEO is bound by the Fiduciary Duty and Duty of Care responsibilities assigned

under the KICD Operating Agreement, including Article XII of that Agreement.

Management Services Agreement, Sec. 1.4.

89.     In the MSA, WII also agreed to comply with all provisions of the Federal Acquisitions Regulations and the regulations of the U.S. Small Business Administration concerning employment practices and its Section 8(a) program.

90.     WII breached the MSA by, among other things, engaging in mismanagement and misappropriation, as more fully described above.

91.     WII breached the MSA by engaging in conduct that resulted in the SBA suspending KICD from government contracting.

92.     WII also breached the MSA by, among other things, causing KICD to (1) engage in related-party transactions that were fraudulent and/or not for equivalent value; (2) enter into or undertake other transactions and transfers that were unrelated to KICD's business, and/or did not provide reasonable value to KICD; and (3) enter into joint ventures or other business arrangements with related third parties without the knowledge and consent of KIC or the KICD Management Committee.

93.     WII's breaches of the MSA have denied KIC the benefit of the agreement and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

## CLAIM FOR RELIEF III

### (Operating Agreement & MSA – WII's Breach of Implied Covenant of Good Faith and Fair Dealing)

94.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

95.     There is a covenant of good faith and fair dealing implied in the Operating Agreement and MSA.

96.     WII breached the covenant of good faith and fair dealing implied in the Operating Agreement and MSA by, among other things, engaging in what can be properly described as mismanagement and misappropriation, as more fully described above.

97.     WII also breached the covenant of good faith and fair dealing implied in the Operating Agreement and MSA by, among other things, causing KICD to (1) engage in related-party transactions

that were fraudulent and/or not for equivalent value; (2) enter into or undertake other transactions and transfers that were unrelated to KICD's business, and/or did not provide reasonable value to KICD; and (3) enter into joint ventures or other business arrangements with related third-parties without the knowledge and consent of KIC or the KICD Management Committee.

98.     WII's breaches of the covenant of good faith and fair dealing implied in the Operating Agreement have denied Plaintiffs the benefit of the Operating Agreement and MSA, and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

99.     WII's breaches of the covenants of good faith and fair dealing were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF IV

### (Civil Conspiracy)

100.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

101.     Acri, Baum, and Hayes were aware that WII was acting contrary to the express terms of the Operating Agreement and MSA, as well as the implied-in-law covenant of good faith and fair dealing.

102.     Acri, Baum, and Hayes conspired, assisted, aided, and abetted WII in the breach of the Operating Agreement and MSA and the implied-in-law covenant of good faith and fair dealing.

103.     Acri, Baum, and Hayes benefitted from the breach of the Operating Agreement and the implied-in-law covenant of good faith and fair dealing.

104.     The conduct of Acri, Baum, and Hayes in conspiring with WII to breach the Operating Agreement and the MSA and the implied-in-law covenant of good faith and fair dealing damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

105.     The conduct of Acri, Baum, and Hayes in conspiring with WII to breach the Operating Agreement and MSA and the implied-in-law covenant of good faith and fair dealing was done intentionally and with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF V

### (WII's Breach of Fiduciary Duties – Common Law and AS 10.50.135)

106.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

107.   Per Section VII.3 of the Operating Agreement, WII, as a Member of the LLC owed KIC and KICD the fiduciary duty to exercise good business judgment and to act with care, honesty, and loyalty.

108.   WII breached those duties.

109.   Further, WII engaged in conduct that can properly be described as mismanagement and misappropriation, as more fully described above.

110.   All related-party transactions that were not specifically approved by KIC or the KICD Management Committee are void under AS 10.50.140.

111.   WII's breach of fiduciary duties to Plaintiffs have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

112.   WII's breaches of fiduciary duties were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF VI

### (Acri's Breach of Fiduciary Duties – Common Law and AS 10.50.135)

113.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

114.   As the President and CEO of KICD, and per ¶ 1.4 of the MSA, Acri owed KICD the fiduciary duty to exercise good business judgment and to act with care, honesty, and loyalty.

115.   Acri breached those duties.

116.   Further, Acri engaged in conduct that can properly be described as mismanagement and misappropriation, as more fully described above.

117.   All related-party transactions that were not specifically approved by KIC or the KICD Management Committee are void under AS 10.50.140.

118. Acri's breach of fiduciary duties to Plaintiffs have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

119. Acri's breaches of fiduciary duties were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF VII

### (Civil Conspiracy – Breach of Fiduciary Duty)

120. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

121. Baum was aware that WII, Acri, and their co-conspirators were acting contrary to the express terms of the Operating Agreement, as well as the fiduciary duties prescribed therein.

122. Baum conspired, assisted, aided and abetted WII, Acri, and Hayes in the breach of the Operating Agreement including the fiduciary duties prescribed therein.

123. Baum benefitted from the breach of the Operating Agreement, as well as the fiduciary duties prescribed therein.

124. The conduct of Baum in conspiring with WII, Acri, and Hayes to breach the Operating Agreement, including the fiduciary duties prescribed therein, damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

125. The conduct of Baum in conspiring with WII, Acri, and their co-conspirators to breach the Operating Agreement, as well as the fiduciary duties prescribed therein, was done intentionally and with reckless disregard for the rights of Plaintiffs and entitled Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF VIII

### (Hayes's Breach of Fiduciary Duties)

126. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

127. As an officer of KICD, Hayes owed KICD the fiduciary duty to exercise good business judgment and to act with care, honesty, and loyalty.

128. Hayes breached those duties.

129. Further, Hayes engaged in conduct that can properly be described as mismanagement and misappropriation, as more fully described above.

130. Hayes's breach of fiduciary duties to Plaintiffs have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

131. Hayes's breaches of fiduciary duties were done intentionally and with reckless disregard for the rights of Plaintiffs and entitled Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF IX

### (WII's Breach of Duty of Good Faith)

133. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

134. WII owed Plaintiffs a duty to act in good faith and deal fairly, and WII breached that duty.

135. For example, WII breached the duty to act in good faith by, among other things, causing KICD to (1) engage in related-party transactions that were fraudulent and/or not for equivalent value; (2) enter into or undertake other transactions and transfers that were unrelated to KICD's business, and/or did not provide reasonable value to KICD; (3) enter into joint ventures or other business arrangements with related third-parties without the knowledge and consent of KIC or the KICD Management Committee; and (4) destroy its own documents and computerized information.

136. Further, WII engaged in conduct that can be properly described as mismanagement and misappropriation, as more fully described above.

137. WII's breaches of the duty of good faith have denied Plaintiffs the benefit of the Operating Agreement, and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

138. WII's breaches of the duty of good faith were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF X

### (Intentional Spoliation of Evidence)

139. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

140. The Walton Parties intentionally destroyed the business records of KICD in an effort to both cover up their improper conduct and to make it difficult for the Plaintiffs to bring claims against them.

141. The Walton Parties also intentionally erased or "scrubbed" data from at least one computer in an effort to both cover up their improper conduct and to make it difficult for the Plaintiffs to bring claims against them.

142. The Walton Parties also intentionally and permanently removed at least one computer server from the KICD offices in an effort to both cover up their improper conduct and to make it difficult for the Plaintiffs to bring claims against them.

143. The act of destroying documents and data has made it more difficult to prove the claims being asserted by Plaintiffs.

144. The conduct of the Walton Parties in destroying documents and data has damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

145. The conduct of the Walton Parties was done intentionally and with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF XI

### (Computer Fraud and Conversion)

146. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

147. Just after Acri was removed as the CEO of KICD, the Walton Parties directed employees and others to remove and destroy computerized data belonging to KICD.

148. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), permits any person who suffers damage or loss by reason of the activities prohibited by this federal statute to bring a civil action for damages and injunctive relief.

149.   The Walton Parties' actions described above violate 18 U.S.C. § 1030(a)(2)(C), (4), and (5).

150.   The conduct of the Walton Parties has damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

152.   The conduct of the Walton Parties was done intentionally and with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF XII

### (Conversion)

153.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

154.   The Walton Parties have intentionally interfered with Plaintiff's possession of Plaintiffs' property, including without limitation business records, files, and computers.

155.   The Walton Parties have also intentionally converted Plaintiffs' property by causing KICD to, among other things, (1) engage in related-party transactions that were fraudulent and/or not for equivalent value; (2) enter into or undertake other transactions and transfers that were unrelated to KICD's business, and/or did not provide reasonable value to KICD; and (3) enter into joint ventures or other business arrangements with related third-parties without the knowledge and consent of KIC or the KICD Management Committee.

156.   The Walton Parties' conversion of property had damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

157.   The Walton Parties' conversion of property was done intentionally and with reckless disregard for the rights of plaintiffs and entitles Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF XIII

### (Unfair Trade Practices Act)

158.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

159. The Walton Parties engaged in a series of related-party and self-dealing transactions without giving notice to KIC or the KIC Management Committee.

160. Those related-party and self-dealing transactions are prohibited "unfair or deceptive acts or practices" under AS 45.50.471.

161. The unfair and deceptive acts of the Walton Parties have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial, and entitle Plaintiffs to an award of treble damages, punitive damages and full actual attorneys' fees under the Act.

162. To the extent the Walton Parties' misrepresentations were done intentionally and with reckless disregard for the rights of plaintiffs, plaintiffs are entitled to punitive and exemplary damages in an amount to be established at trial.

## CLAIM FOR RELIEF XIV

### (Misrepresentation)

163. Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

164. WII, Acri, and Baum made false or misleading statements to KIC, knowing that the statements were false or misleading and intending that KIC would rely on those statements.

165. More specifically, WII, Acri, and Baum told KIC that it needed to expand the bonding capacity of KICD for the continued growth of KICD when they knew that KICD did not need additional bonding (or, at least, not as much as Acri and Baum proposed).

166. WII, Acri, and Baum encouraged KIC to undertake additional bonding, but did not disclose to KIC that they really intended the accounts to be disguised loans, nor that as such, the accounts violated the conditions SBA imposed in 2006 regarding loans to KICD.

167. WII, Acri, and Baum encouraged KIC to undertake additional bonding but did not disclose that KIC would be obligated to make interest and other payments on the collateral.

168. KIC reasonably relied on WII, Acri, and Baum.

169. KIC suffered a monetary loss related to the bonding and would not have suffered that loss but for WII, Acri, and Baum's misleading statements.

## CLAIM FOR RELIEF XV

## (Unjust Enrichment)

170.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

171.   Plaintiffs conferred benefits upon Defendants, which benefits Defendants have enjoyed.

172.   Under the circumstances described above, it would be inequitable for Defendants to retain these benefits.

## CLAIM FOR RELIEF XVI

## (Declaratory Judgment)

173.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

174.   KIC has notified WII that it is in Default under the terms of the Operating Agreement.

175.   KIC exercised its rights under the Operating Agreement to purchase WII's membership interest in KICD.

176.   Article IX of the Operating Agreement governs acquisition by KIC of WII's interest in KICD.

177.   Whatever the purchase price of WII's interest is determined to be, KIC is entitled to offset amounts owed by WII to KIC for all claims alleged herein, without limitation, including breaches of the Operating Agreement, misrepresentation, and fraud.

178.   KIC asks this Court to declare the purchase price of WII's interest, upon the evidence adduced at trial, including the impact of the related-party transactions and all offsets due Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief against all Defendants:

1.   Compensatory, consequential, treble, and punitive damages in an amount to be proven at trial, but in any event in excess of $100,000, and likely to be in excess of $3,000,000;

2.   Restitution and any other available equitable relief;

3.   That the Court order pre-judgment remedies in favor of Plaintiffs for recovery of the funds fraudulently and inequitably transferred to Defendants;

1    4.    Declaratory relief in the form of the purchase price of WII's interest in KICD, as well as

2    the amount of offsets against the purchase price;

3    5.    Actual attorneys' fees and costs;

4    6.    Pre-judgment and post-judgment interest at the highest allowable rate; and

5    7.    Such other and further relief as this Court may deem just and equitable.

6    DATED this 30 day of April , 2013.

CALFO HARRIGAN LEYH & EAKES LLP

ABA 0405015

By
Angelo J. Calfo, WSBA #27079
Andrea D. Ostrovsky, WSBA #37749
999 Third Avenue, Suite 4400
Seattle, WA 98104
Tel: (206) 623-1700
Fax: (206) 623-8717
Email: andreao@calfoharrigan.com

CASHION GILMORE LLC

By
Chester D. Gilmore, AK ID #0405015
421 W. 1st Ave., Suite 247
Anchorage, AK 99501
Tel: (907) 222-7934
Facx: (907) 222-7938
Email: chester@cashiongilmore.com

*Attorneys for Plaintiffs*

## First Amended Operating Agreement
## of
## KIC DEVELOPMENT, LLC

This First Amended Operating Agreement is made by and among KIC Development, LLC (hereinafter "KICD" or "the Company"), and Kikiktagruk Inupiat Corporation (KIC) and Walton Invesco, Inc. (WII). KIC and WII are hereinafter referred to as "Members."

Upon the execution of this First Amended Operating Agreement by the entities above-named, the existing Operating Agreement of KICD shall be deemed to have no further force or effect, and the LLC shall conduct its operations in accordance with this First Amended Operating Agreement.

## ARTICLE I
## FORMATION, NAME AND ADDRESS

Section 1. Formation. The parties named above are owners of a limited liability company under the laws of the State of Alaska, AS 10.50.010 - 10.50.995 (the "LLC Act"). Except as provided herein, the LLC Act and the Sale of Interest Agreement entered by KIC and WII shall govern the rights and liabilities of the Members.

Section 2. Name. The name of the Company is KIC Development, LLC.

Section 3. Address - The principal offices of the Company are in (Kotzebue), Alaska located at P.O. Box 1050, 373 A Second Ave., Kotzebue, Alaska 99752. The Company may have additional offices at other places as the MC may agree.

Section 4. Nature of Business. The purposes of the Company are as stated in its articles of incorporation which include allowing it to engage in the business of providing professional services to government and commercial clients as an SBA Section 8(a) program participant, and to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purpose and that is not forbidden by the LLC Act. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business. The Company exists only for the purposes specified in this section, and may not conduct any other business.

## ARTICLE II
## CAPITAL

Section 1. Initial Capital and Interest in Company. The initial capital of the Company shall be $50,000. WII shall contribute $24,500 in cash to the capital of the Company. The prior contribution by KIC of $25,500 is acknowledged. Each shall have the following percentage capital interests:

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC
Revised 31 August 2005



PLAINTIFF
EXHIBIT NO. ___A___
ADMITTED ☐

(CASE NUMBER)

| Member | Initial Capital Contribution | Percentage Capital Interest |
|--------|------------------------------|-----------------------------|
| KIC | $ 25,500 | 51% |
| WII | $ 24,500 | 49% |

**Section 2.** (Section 2 is intentionally omitted.)

**Section 3. Capital Accounts** - A separate capital account shall be maintained for each Member to which shall be debited all distributions of cash or property and the Member's share of net losses and of any separately allocated items of net loss, and to which shall be credited the Member's capital contributions to the Company and the Member's share of net income and of any separately allocated items of income or gain.

**Section 4. Subsequent Capital Contributions** - Each Member, in proportion to the Member's percentage capital interests in the Company, shall make such subsequent capital contributions as the MC may determine are reasonably necessary to pay Company liabilities, as they come due.

**Section 5. Failure to Make Subsequent Capital Contributions** -- If the MC is unable to arrange credit arrangements so that Company liabilities can be paid as they come due, and if the MC subsequently determines that the Members must be called upon for a further capital contribution, then, if any Member fails to make his or its share of subsequent capital contributions, the MC may permit other Members to loan the Company the additional funds, upon reasonable terms, or to contribute some or all of the delinquent contribution and thereafter, if so agreed, each Member shall have such percentage capital interest in the Company as his or its total capital contributions bear to the aggregate capital contributions of all Members. If contributions by other Members do not satisfy the delinquent contribution, the delinquent Member shall be a default as described in Article X and interest paid on any loan to cover the delinquent contribution shall be charged to the delinquent Member's capital account.

**Section 6. Interest** - No interest shall be paid on any capital contributions to the Company; provided, however, that interest may be paid on any direct loan or advance made by a Member to the Company.

**Section 7. Loans and other Business Transactions.** Any member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms and conditions upon which the members of the Company and/or the Company's Management Committee ("MC") agree. Members may also transact other business with the Company, including but not limited to business development activities with similar approval and, in doing so, they shall have the same rights ( e.g. to compensation and expense reimbursement) and be subject to the same obligations arising out of such business transaction as would be enjoyed by and imposed upon any person, not a member, engaged in a similar business transaction with the Company. No adjustments will be made to a member's Capital Account percentage hereunder based solely on such loans or business activities or their treatment for tax or accounting purposes.

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC        2
Revised 31 August 2005

Section 8. Compliance with Section 704(b) of the Code. The provisions of this Article are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit to have substantial economic effect under the regulations promulgated under section 704(b) of the Internal Revenue Code. Notwithstanding anything herein to the contrary, this Operating Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any member to make a contribution in excess of the initial capital contribution or any subsequent capital contributions as provided by this Article.

## ARTICLE III
## PROFIT AND LOSS; OTHER FINANCIAL/ACCOUNTING MATTERS

Section 1. Profits and Loss – Unless otherwise agreed by the Members with respect to a particular project, the net income and losses and other tax and accounting items of the Company shall be allocated between all Members proportional to their percentage capital interests in the Company at the time of the (initial) allocation.

Section 2. Withdrawals - No Member may withdraw capital of the Company except as agreed by the MC. No interest shall accrue on any capital contribution.

Section 3. Distributions – From time to time the MC may distribute to the Members cash and property proportional to their percentage capital interests in the Company at the time of distribution.

Section 4. Indemnity and Contribution - The Company shall indemnify, defend and hold harmless any Member against any liability in excess of such Member's percentage capital interest in the Company. Any Member who incurs a Company liability without authority to do so shall indemnify, defend and hold harmless the Company and the other Members against the entire amount of such liability.

Section 5. Methods of Accounting - The Company shall keep its accounts and records in accordance with generally accepted accounting principles, consistently applied, on an accrual basis. The Company may keep its accounts and records on a different basis for tax purposes, only, if permitted by applicable tax laws by a licensed and certified CPA.

Section 6. Fiscal Year - The Company's fiscal year shall be April 1 – March 31.

Section 7. Books - Company books shall be maintained at the principal office of the Company, or any other place as the Members from time to time may elect, and the Members or their authorized representatives at all times shall have access to the books and records. The books shall be closed and balanced at the end of each fiscal year. The MC shall provide for the audit of the Company's books at least annually.

## ARTICLE IV
## INITIAL MEMBERS AND MANAGER

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC    3
Revised 31 August 2005

Initial Members of the LLC ("Members") and the initial Manager are:

Initial Members:

| Kikiktagruk Inupiat Corp<br>P. O. Box 1050<br>Kotzebue, Alaska 99752 | Walton Invesco, Inc.<br>1 Willard Road<br>Norwalk, Connecticut 06851 |
| --- | --- |
|  |  |

Initial Manager (Management Committee ("MC") 2 members):

| KIC Primary Representative<br>("MCR"): | WII Primary Representative<br>("MCR"): |
| --- | --- |
| Kris W. Lethin | To be nominated by WII |
| KIC Alternate<br>Donald L. Gallahorn | WII Alternate: |

## ARTICLE V
## MANAGEMENT AND OPERATIONS

Section 1. Manager.

1.1 **Exclusive power to bind the Company.** The general management, control and conduct of the business of the Company shall be vested in the MC. The MC may delegate authority to the Company's officers, employees, project managers or agents, unless such delegation would jeopardize the Company's ability to participate in the Section 8(a) program of the U.S. Small Business Administration. Except to the extent the LLC Act or this Agreement gives the Members a right, or requires the Members, to vote or otherwise participate in management of the Company, only the MC and agents of the Company authorized by the MC shall have the authority to bind the Company. No Member who is not authorized by the MC or otherwise authorized as an agent of the Company shall or may take any action to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. The MC has the power, on behalf of the Company, to do all things necessary, appropriate or convenient to carry out the business and affairs of the Company.

1.2 **Manager as Management Committee: weighted voting.** The MC is the KICD Management Committee ("MC"). The MC shall consist of one representative nominated by KIC and one member nominated by WII and may include alternates designated by each member of KICD. Each representative (MCR) shall have voting power proportionate to the percentage capital interest attributable to the Member of KICD who designated that MCR. Actions of the MC shall be by majority vote measured by the percentage of capital interest attributable to each MCR *and in no case*

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC                4
Revised 31 August 2005

*shall KIC MCR's voting power be less than 50% plus one.* An Alternate MCR may participate when a primary member is present but carries no vote.

Section 2. <u>Number and Appointment</u> - There shall be a primary MCR and one or more alternate MCRs for each Member. *Regardless of the number of members appointed to the MC KIC's MCR shall always have control of the MC and have a voting power of not less than 50% plus one.* An alternate has all the voting rights of a primary MCR if the primary MC member is absent or unavailable and also may vote the appointing Member's interest in the event the primary MCR has a disabling conflict of interest. The initial MCRs are set forth in Article IV. If any individual ceases to serve as an MCR, the appointing Member shall appoint a successor. All appointments must be in a writing signed by a Member.

Section 3. <u>Resignations and Removals on Management Committee</u>

An MCR may resign by giving the MC and the MCR's appointing authority oral or written notice. A Member may remove its MCR by giving the MCR oral or written notice. If an MCR ceases serving on the MC, the Member that appointed the MCR shall appoint a replacement MCR. If a Member that appointed an MCR ceases to be a Member, all MCRs appointed by that Member shall automatically be removed. The appointing Member may remove its MCR for cause or for any other reason or for no reason.

Section 4. <u>Action by Manager</u> -

4.1 **Majority Vote of Ownership Interest Required.** *Regardless of the number of members appointed to the MC KIC's MCR shall always have control of the MC and have a voting power of not less than 50% plus one.* The consent of a majority of voting interests of all the Members exercised through MCRs after consultation with each other is required to conduct all business of the Company. The "voting interest" of an MCR is equal to the percentage ownership interest of the appointing Member.

4.2 **Meetings and Action without Meeting.** Any action required by law or this Agreement to be taken by the MC at a formal meeting of the MC may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action taken shall be signed by all of the MCRs entitled to vote on the action. MCRs may participate in and hold a meeting, and may attend a meeting(s), by means of conference telephone or similar communications equipment which permits all MCRs participating in the meeting to hear each other. Participation in a meeting in such manner shall constitute attendance and presence at the meeting.

4.3 **Minutes.** All formal meetings of the MC shall be evidenced by written minutes, copies of which shall be made available to MCRs and Members promptly after the conclusion of each meeting.

Section 5. <u>Compensation of Manager.</u> The MC shall not be compensated by the Company for its services as Manager. Any Member appointing an MCR may compensate its appointed MCR.

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC                5
Revised 31 August 2005

## ARTICLE VI
## OFFICERS

Section 1. Officers. If the MC elects to delegate management authority to Company officers, the officers of the Company shall be a Chief Executive Officer and a Chief Operating Officer, designated project managers and such other officers as the MC may determine. The same person may hold any two or more offices. An MCR also may serve as an officer.

Section 2. Election. The officers chosen by the MC shall hold office for the term for which elected and until their successors have been elected and qualified. The MC may fill a vacancy in any office arising from any cause for the unexpired portion of the term.

Section 3. Removal. The MC may remove any officer from office at any time with or without cause. An officer removed is entitled all rights and obligations under any contract of employment between the Company and the officer provided that the right to remove an officer cannot be contracted away.

Section 4. Delegation of Powers. The MC may from time to time define the power or duties of any officer of the Company, and may, in the event of his absence or failure to act, delegate any of the officer's powers or duties to any other officer or person whom the MC may select.

Section 5. Compensation. The payment and amount of compensation of each officer shall be such as the MC may from time to time determine.

Section 6. Chief Executive Officer (CEO). Except as the MC may otherwise direct, the Chief Executive Officer shall be the chief executive officer of the Company and shall have general charge of the business and affairs of the Company, subject, however, to the approval, authorization or ratification by the MC, and shall work closely and jointly with the Chief Operating Officer to achieve the goals of the Company,

Section 7. Chief Operating Officer (COO). Except as the MC may otherwise direct, the COO shall be the chief operating officer of the Company and shall have general charge of the operations of the Company, subject, however, to the approval, authorization or ratification by the MC, and shall work closely and jointly with the CEO to achieve the goals of the Company.

Section 8 Project Manager

8.1     Appointment and Term of Office. The MC may appoint any Person, including a Member, as a Project Manager of one or more Projects or potential Projects. The MC shall establish the terms of employment, the scope of work and compensation for a Project Manager. The appointment and the scope of any delegation of the MC's authority shall be recorded in the minutes of the MC.

8.2     Duties of Project Manager. A Project Manager shall implement and execute all of those ordinary, routine and usual business affairs of the Company and perform that work that shall be

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC          6
Revised 31 August 2005

delegated or assigned to that Project Manager in writing by the MC. A Project Manager may commit or expend only those funds that have been budgeted by the MC for the Project or potential Project administered by that Project Manager.

   8.3   Fiduciary Duty and Duty of Care.  (a) A Project Manager shall be charged with the fiduciary duty of an officer to the Company.  A Project Manager shall perform the duties of management in good faith, in a manner the Project Manager reasonably believes to be in the best interests of the Company, and with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances. None of the executive authority or executive duties of a Project Manager shall be assignable voluntarily or by operation of law to any other Person. This position does not limit the ability of a Project Manager to assign the carrying out of the Project Manager's directions in the ordinary course of management.

   8.4   Local Training and Local Hire.  The Company recognizes its responsibility as an SBA Section 8(a) program participant to perform work with its own employees. Every Project Manager shall be charged with the particular and special responsibility to exercise a creative and concerted effort to train and to hire for every position authorized for a Project, or to cause subcontractors to hire as many people as is reasonably possible who are either shareholders or immediate family members (parents, spouses, children, and grandchildren) of shareholders of Kikiktagruk Inupiat Corporation.

   8.5   Conflicts of Interest.  A contract or other transaction between the Company and an officer of the Company or some other entity in which a Company officer is a manager, officer or director or a transaction between the Company and a Member or an affiliate or director or officer of a Member is not void or voidable because the officer is present at the meeting of the MC that authorizes, approves, or ratifies the contract or transaction, provided, the material facts of the transaction and the officer's potential conflict are fully disclosed or known to the MC and either the MC authorizes, approves, or ratifies the contract or transaction in good faith by a sufficient vote, or the contract or transaction is approved unanimously.

## ARTICLE VII
## RIGHTS AND DUTIES OF MEMBERS

   Section 1. Management Rights.  A Member shall not be entitled to participate in the day-to-day affairs and management of the Company except on specific authorization of the MC. Instead, a Member's right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the LLC Act or this Agreement vest in the Member the right to so vote or otherwise participate.

   Section 2. Liability of Members.  No Member, or officer, director, manager, employee or agent of a Member, shall be liable as such for any Company liability. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on any Member, or officer, director, manager, employee or agent of a Member, for any Company liability.

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC      7
Revised 31 August 2005

Section 3. Fiduciary Duties. Notwithstanding AS 10.50.130 but as may be modified by this Agreement, each Member shall have fiduciary duties to the other Members, to the MC, and to the Company similar to the fiduciary duties of members of a joint venture, in addition to any fiduciary duties it may have as a member of the MC.

Section 4. Meetings of Members. Upon request by the MC or Members owning more than 5% of the percentage capital interests, the MC shall call a meeting of the Members for the transaction of such business as may be specified. Only business within the purpose or purposes described in the notice of meeting (or waiver of notice) may be conducted at a meeting of the Members. Each Member shall bear his or her own costs incurred in connection with such meetings, unless otherwise approved by the MC. Notice stating the place, day and hour of the meeting, and the purpose for which the meeting is called, shall be given at least five days before the meeting. A quorum shall be present at a meeting of Members if Members owning 51% of the total percentage capital interests of all Members are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of a specified percentage of the percentage capital interests is required by this Agreement or the LLC Act, the affirmative vote of Members owning 51% of the total percentage capital interests of all Members entitled to vote shall be the act of the Members. In each instance where the LLC Act provides for a particular vote unless otherwise provided by this Agreement, the preceding sentences shall be considered to be a provision of this Agreement providing for a different vote. A Member may vote either in person, by its president or by proxy executed in writing. Any action required or permitted to be taken at any meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent in writing, setting forth the action taken, is signed by all the Members entitled to vote on the action showing their approval or disapproval of the action or if the action is approved by a sufficient number of Members to approve the action if the matter was considered at a Members meeting for which all Members were duly noticed or attended. Members may participate in and hold a meeting, and may attend a meeting, by means of conference telephone or similar communications equipment which permits all persons participating in the meeting to hear each other. Participation in a meeting in such manner shall constitute attendance and presence at the meeting.

## ARTICLE VIII
## TRANSFER OF INTERESTS

Section 1. Transfers Prohibited. No Member may directly or indirectly sell, transfer, assign, pledge or otherwise encumber, voluntarily or involuntarily, all or any part of his or its interest in the Company without the prior written consent of all other Members. If all of the other Members do not approve of the transfer, any person claiming to be a transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled only to the rights of a withdrawing member

## ARTICLE IX
## WITHDRAWAL, DEATH, INCAPACITY OR DISSOLUTION OF A MEMBER

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC          8
Revised 31 August 2005

Section 1. <u>Withdrawal</u>. Each Member shall have the right to withdraw from the Company, but only upon written notice of intention to withdraw served upon the other Members, at their most recent addresses contained in the Company records, at least six (6) months prior to the effective date of withdrawal. In the event of the withdrawal of Kikiktagruk Inupiat Corporation, it agrees, if requested to do so, to give Walton Invesco, Inc. time to replace it as a member of the Company with a socially and economically disadvantaged person to assure the Company's ability to continue as participant in the SBA Section 8(a) and avoid a termination for the convenience of the government of existing contracts, not to exceed 90 additional days.

Section 2. <u>Acquisition of Interest</u>. Upon withdrawal of a Member on the terms in Section 1, or upon the default as defined in Article X, dissolution, death or incapacity of a Member, the Company and its remaining member(s) shall have an election either (1) to acquire the Member's interest in the Company, or (2) to dissolve and liquidate the Company business. If the Company elects to acquire the interest of the withdrawing, defaulting, dissolved, deceased or incapacitated Member, it shall serve notice in writing of such election upon the Member, or the Member's guardian or personal representative, within ninety (90) days after the receipt of notice of either the intention to withdraw, the date of default, or the receipt of notice of proposed dissolution or appointment of a receiver, guardian or personal representative, as applicable. The purchase price shall be determined and paid as provided in Sections 3 and 4. If the Company elects not to purchase the interest of the withdrawing, defaulting, dissolved, deceased or incapacitated Member in the Company, the Company shall proceed with reasonable promptness to dissolve and liquidate the business of the Company and to distribute the assets of the Company, in which case any defaulting Member shall cease to be a Member and shall become an assignee of the defaulting Member's interest.

Section 3. <u>Procedure to Determine Price</u>.

3.1    **Negotiation.** If the Company effectively exercises the option to purchase and there is no "fixed price" for the interest subject to such exercise which was effective as of the date withdrawal, default, dissolution, death, or incapacity of the Member, then the Company and the member or successor in interest of the member shall first attempt to arrive at an appropriate valuation of the interest by negotiation.

3.2    **Appraisal.** In the event a satisfactory figure cannot be arrived at, the parties shall select an appraiser, who shall determine fair market value of the interest. In the event the parties cannot agree on the selection of an appraiser, each party shall select an appraiser and the two appraisers selected shall select a third appraiser and the three of them shall value the interest by majority vote, which shall be binding upon the parties. Any appraiser selected hereunder shall be an appraiser with expertise in the valuation of assets and interests similar to the assets or interests required to be valued hereunder. The parties hereto pledge their best efforts and cooperation to determine the value of the interest within a reasonable time after the option is exercised.

3.3    <u>Fixed Price Defined</u>. A "fixed price" for an interest shall mean a price which has been reduced to writing signed by all members subject to this Agreement and which represents and reflects an agreed value for interest. Any price which has been fixed and reduced to writing in

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC
Revised 31 August 2005

9

accordance with the foregoing shall be effective for a period of two (2) years after the date of the writing, or if shorter, for the period specified in the writing. Except as otherwise expressly provided in this Agreement, in no event shall a fixed price remain in effect for a period longer than two (2) years after the date of the writing fixing the price. The parties agree to attempt to establish a fixed price at each annual meeting of the members and reduce that fixed price to writing either in the minutes of the annual meeting or on a schedule to be attached to this Agreement.

Section 4. Payment of Price.

4.1 **Exercised within 90 days.** If the option to purchase is exercised by the Company or its remaining member(s), within ninety (90) days after the date the option is exercised or within ninety (90) days after the date the price has been determined, whichever is later, the Company or other purchaser shall pay to the persons entitled thereto according to the following terms, unless otherwise agreed, which may be prepaid in whole or in part without penalty:

4.2 **Installments.** One-third (1/3) of the price upon exercise of the option to purchase. The balance of the price shall be paid in two (2) equal annual installments. Such installment payments shall be paid on or before the first and second anniversary dates, respectively, of the date of the initial payment. In addition to the aforesaid installment payments, interest on the unpaid balance at the rate of nine percent (9%) per annum shall be paid with each installment payment. The balance of the purchase price shall be secured by a pledge of the purchased interest. There shall be no penalty for early payment of the purchase price.

4.3 **Sale of assets or dissolution.** When a purchase is agreed to and, prior to complete payment of the purchase price the Company sells or disposes of substantially all of the Company's assets or the Company determines to dissolve and liquidate, the former Member may declare the unpaid balance of the purchase price to be immediately due and payable.

## ARTICLE X
## DEFAULT

Section 1. Events of Default. A Member shall be in default ("Defaulting Member") upon the occurrence of any of the following events:

(a)     If the Member makes an assignment for the benefit of creditors or applies for the appointment of a trustee, liquidator or receiver of any part of his or its assets or commences any proceedings relating to itself under any federal or state law relating to bankruptcy, insolvency, reorganization, or similar laws;

(b)     If the Member has a proceeding commenced against it relating to the appointment of a trustee, liquidator or receiver or pursuant to any proceedings under any federal or state law relating to bankruptcy, insolvency, reorganization or similar laws, which proceeding is not dismissed or discharged within sixty (60) days after the commencement of such proceeding;

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC          10
Revised 31 August 2005

      (c)      If the Member suffers his or its interest in the Company to become subject to any attachment, levy, execution or other judicial seizure which is not removed, stopped or bonded within sixty (60) days; or

      (d)      If the Member breaches or fails to perform any other provision of this Agreement and such breach or failure is not cured within thirty (30) days after written notice by the other Member requesting that the default be cured.

      Section 2. Remedies. Upon any Member becoming a Defaulting Member, the Company and remaining Members may, in their sole discretion,

      (a)      Dissolve and terminate the Company and offset against any amount to be distributed or paid to the Defaulting Member any and all damages caused the Company by the Defaulting Member; or

      (b)      Elect to purchase the interest of the Defaulting Member in the Company pursuant to Article IX, Section 2 which the Defaulting Member shall be deemed to have offered to the Company and its remaining member(s);

      (c)      Waive the default, in which case the Defaulting Member shall cease to be a Member and shall become an assignee of the Defaulting Member's interest; and

      (d)      In addition, pursue any remedy at law or in equity against the Defaulting Member.

      Section 3. Loss of Voting Rights. A Defaulting Member, and any MCR appointed by a Defaulting Member, shall have no right to vote upon or otherwise participate in management of the Company, regardless of whether a remaining Member has commenced to exercise any available remedies.

## ARTICLE XI
## DURATION AND DISSOLUTION

      Section 1. Duration. The existence of the Company is perpetual unless the Company is dissolved as a result of the occurrence of an event described in section 2 of this Article.

      Section 2. Dissolution. The Company shall be dissolved upon the occurrence of any of the following events:

      (a)      Agreement by all Members;

      (b)      The sale or disposition of all of the Company assets;

      (c)      The election of the Non-Defaulting Members upon the default of a Member.

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC      11
Revised 31 August 2005

No Member shall have the right to dissolve the Company for any reason other than as set forth above or to withdraw from the Company other than on such terms and conditions as may be permitted in this Agreement. Each Member hereby waives any rights it may have under state law to partition the Company property.

Section 3. <u>Distribution of Assets on Dissolution</u>. If the Company is dissolved, the Company affairs shall be wound up as expeditiously as possible, the assets liquidated to the extent practicable, and the Company terminated. Any Member may be a purchaser of any or all of the assets during liquidation.

Section 4.      <u>No Obligation to Restore Negative Capital Account Balance on Liquidation</u>. Notwithstanding anything to the contrary in this Agreement, upon liquidation of the Company under AS 10.50.400-440, if any Member has a negative capital account balance (after giving effect to all contributions, distributions, allocations and other capital account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any capital contribution to the Company, and the negative balance of such Member's capital account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

## ARTICLE XII
## CONFIDENTIALITY AND COMPETITION
## by MEMBER WITH THE COMPANY

Section 1. <u>Confidentiality.</u>

Each Member, its representatives, agents and employees, and the officers, agents and employees of the Company, shall hold in strict confidence and not use or disclose to any person or organization any information or data concerning the Company or a Member. The above restrictions on the disclosure of information shall not apply to the extent that (1) such information has been published or constitutes a matter of public knowledge or public record as a result of actions other than those of the using or disclosing party; or (2) such disclosure is necessary for communications with and reporting to the board of directors or other governing body of the Member or such information may reasonably be a matter of shareholder interest and appropriate corporate reporting and the disclosure of the information will cause no harm to a business interest of any Member or of the Company; or (3) such disclosure reasonably appears required by any court or public agency having jurisdiction over the Member or Manager, provided that reasonable prior notice of potential disclosure is given to the CEO or the MC, if practicable; or (4) such information was obtained by the using or disclosing Member or Manager from a third party. No press releases or other public statements concerning the Company's activities shall be made without the prior approval of the MC.

Section 2. <u>Corporate Opportunity.</u> No member, member of the MC, or affiliate or officer or

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC          12
Revised 31 August 2005

director of a Member or affiliate or officer of the Company shall exploit from the Company or appropriate to itself any potential work, project or business opportunity within the scope of services described as business of the Company at Article I, Section 4 above, without first notifying the MC within a reasonable time in writing of all material facts pertaining to the potential project or business opportunity, without first offering any and all reasonable assistance to the Company as would enable the Company to pursue or assume such potential work, project or business opportunity and without first obtaining from the MC approval to pursue that potential project or business opportunity in place of the Company. Failure of the MC to decide the question within ten (10) working days of receipt in writing of all material facts shall be construed as approval for a party to pursue the potential project or business opportunity without further claim or participation by the Company.

Section 3. Limitation on Scope of Services.

Nothing in this article prohibits or otherwise restricts any Member or affiliate from pursuing, independent of the Company, any and all business opportunities of every nature and description, independently or with others, inside or outside the State of Alaska or outside the scope of Article I, Section 4. The Members are aware that each Member operates through subsidiaries and affiliates in various industries with different areas of expertise and separate disciplines from the Company. KIC also engages in activities within the scope of Article 1, Section 4 through subsidiaries or in association with other parties that involve providing services within Alaska Washington, Oregon, California, Nevada, Arizona, Utah, Idaho, and Colorado and other states as agreed upon. These operations will not be deemed competition under this Article. The purposes of this Article are not intended as a restraint on personnel no longer working for KICD who are working for KIC or other KIC subsidiaries from maintaining business relations with suppliers, customers and others who had a business relation with KICD.

## ARTICLE XIII
## MISCELLANEOUS

Section 1. Amendments. This Operating Agreement may be amended, supplemented or repealed only by the Members, but only upon the written consent of all Members.

Section 2. Notices. All notices under this agreement shall be in writing and shall be given to the Members at the addresses as the Members may specify in writing, and to the Company at its principal office. Written notices include notices delivered to an authorized address by facsimile transmission.

Section 3. Binding Effect. This agreement shall be binding on the parties hereto, their respective heirs, executors, administrators and assigns.

Section 4. Arbitration. In the event of a dispute between the Members with respect to any aspect of the Company or this Agreement, the dispute shall be resolved under such arbitration rules and forum as the parties may mutually elect, and if no election the Commercial Rules of Arbitration of the American Arbitration Association by a single arbitrator, to be appointed by the Director of the

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC          13
Revised 31 August 2005

Seattle Regional Office of the American Arbitration Association. The arbitrator may designate a prevailing party in the dispute, whose costs and actual attorney's fees incurred in the dispute shall be paid by the other parties.

Section 5. Governing Law. This agreement shall be governed in all respects by the laws of the State of Alaska. In the event litigation between the Members is allowed in spite of the binding arbitration agreement, venue shall be in Anchorage, Alaska.

Section 6. Entire Agreement. This Agreement contains the final, entire agreement between the parties with respect to the formation, dissolution and governance of the Company. Any additional representation, warranty, covenant or condition not set forth in writing signed by the Members shall be void and of no effect.

Section 7. Interpretation. This Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Agreement is expressly prohibited or ineffective under the Alaska Revised Limited Liability Company Act (AS10.50), this Agreement shall govern even when inconsistent with or different than the provisions of the Act. To the extent any provision of this Agreement is prohibited or ineffective under the Act or the Internal Revenue Code or associated regulations, this Agreement shall be considered amended to the smallest degree necessary in order to make this Agreement effective under the Act, the IRS code and regulations adopted pursuant to either.

Section 8. No Partnership Intended for Nontax Purposes. The Members have formed the Company under the LLC Act, and expressly do not intend hereby to form a partnership under either the Alaska Uniform Partnership Act nor the Alaska Uniform Limited Partnership Act.

Section 9. Rights of Creditors and Third Parties under Operating Agreement. This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their permitted successors and assignees. The Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement, or any agreement between the Company and any Member with respect to any capital contribution or otherwise.

Section 10. Negotiations - The Members represent and agree that the terms and provisions of this Agreement are the result of arm's length negotiations between the Members and that each Member has had the benefit of counsel, to the extent he or it deemed appropriate. Therefore, this Agreement shall not be construed either for or against a particular Member by reason of draftsmanship or otherwise.

Section 11. No Waiver. No waiver by any party of any default by any other party in the performance of any provision, condition or requirement of this Agreement shall be deemed to be a waiver of, or in any manner release the other party from, performance of any other provision, condition or requirement of this Agreement. Nor is any waiver of default by a party deemed to be a waiver of, or in any manner release the other party from, future performance of the provision,

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC          14
Revised 31 August 2005

condition or requirement; nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right or any like right accruing to it thereafter.

SECTION 12. Loans To The Company. Nothing in this agreement shall prevent any Member from making a secured or unsecured loan to the Company, if that loan is expressly authorized and accepted by a recorded action of the Members Committee. Any Member who loans funds to the Company shall also be paid interest at the rate of prime plus a percent per annum fixed in the loan.

KIC Development, LLC

By

Kikiktagruk Inupiat Corporation, as Member of KICD and as Member of the KICD Management Committee

DATED: 12-26-05    By:

Walton Invesco, Inc. , as Member and as Member of the KICD Management Committee

DATED: 12/24/05    By:

FIRST AMENDED OPERATING AGREEMENT OF KIC DEVELOPMENT, LLC     15
Revised 31 August 2005

# Management Services Agreement

This Management Services Agreement ("Agreement") is made on this 26ᵗʰ day of

_Queake_, 2005, between KIC Development, LLC (KICD), Walton Invesco, Inc (WII):

## I. Personnel

1.1     Subject to the terms and conditions of this Agreement and the Operating Agreement between the members of KICD, WII agrees to furnish KICD, and KICD agrees to utilize from WII, employee services including selection of a Chief Executive Officer (CEO) for KICD to perform all functions necessary or appropriate for the office of CEO of KICD as the duties of that office shall be defined by KICD. WII will also provide personnel for any other office or position on KICD's request.

1.2     Effective with this agreement, Anthony Acri ("Acri") will be the CEO of KICD until such time as the Management Committee determines a change is required.

1.3     Acri shall be permitted to engage in other activities, with the limitation that he must perform all necessary and appropriate required duties as CEO of KICD and all directives of the Management Committee as his first priority.

1.4     All outside activities must be subordinated to his duties to KICD, and in the event of a conflict, KICD must receive first priority. WII will report to KICD regarding other commercial activities it assigns to the KICD CEO and other commercial activities in which the CEO is engaged. The CEO is bound by the Fiduciary Duty and Duty of Care responsibilities assigned under the KICD Operating Agreement, including Article XII of that Agreement.

051705 jeh MANAGEMENT SERVICES AGREEMENT.doc

1



PLAINTIFF
EXHIBIT NO. B
ADMITTED ☐

(CASE NUMBER)

## II. Term of Agreement

2.1    This Agreement shall commence on the date written above and remain in force and effect for a term of one year, subject to renewal, unless terminated by any party upon the deliver of a 30 days notice of termination

2.2    In the event Acri resigns from his employment with WII or desires to be relieved of his duties at DICD or is requested to resign by the Management Committee, WII will recruit and hire a replacement employee, if requested by KICD in writing to do so.

2.3    KICD shall pay $16,664.13 per month to WII for the services provided to KICD by Acri. This figure includes any amounts which may be owing to Mr. Acri (or any successor) from the date of this agreement for salary, bonuses, private benefits, statutory benefits, taxes and withholding, but not travel and expenses.  To the extent that the time Acri commits to his responsibilities as CEO become significantly less than full time, the parties may agree to a reduced monthly figure.  To the extent that the success of KICD's activities is attributable to Acri's work, the parties may agree to enhance the monthly payment

## III. Administration

WII is the employer of Acri and is liable as such for all purposes.

## IV. Supervision

WII shall have no power to supervise or direct Acri in the performance of his duties to KICD, and all rights to do so shall remain solely in KICD through the Management Committee.

051705 jch MANAGEMENT SERVICES AGREEMENT.doc

2

## V. Payment for Services

5.1     In consideration of the personnel services provided by WII under this Agreement, WII and KICD agree that WII shall submit to KICD its invoice for reasonable fees and expenditures made by or on behalf of the employee, which shall be in a format and on a form provided by KICD. All invoices are due on or before the 6th day of each month for the prior month=s activities; provided, however, that WII shall accrue its costs and expenses for a reasonable period of time sufficient to permit KICD to conduct adequate business development in order to function as a viable federal contractor, and shall thereafter be paid each month for all current invoices, and a reasonable portion of all past invoices.

5.2     The rate charged for Acri's services stated in paragraph II does not include travel and expenses. Charges for reasonable travel and expenses, and workers compensation or other insurance coverage, as required, shall be invoiced to KICD by WII together with any other charges according to the schedule stated herein.

5.3     All invoices shall be paid by KICD within 10 business days of receipt by KICD in proper form and with all required documentation, except as provided above. The Management Committee and WII may agree in writing to a different time period for invoice submission and for payment, provided that any writing bear the signatures of both the Management Committee and WII.

## VI. Insurance

6.1     Unless coverage is provided by KICD, WII shall furnish, and keep in full force and effect at all times during the term of this Agreement, workers' compensation insurance covering all

051705 jeh MANAGEMENT SERVICES AGREEMENT.doc                                                          3

WII's employees furnished to KICD pursuant to the terms of this Agreement. Upon written request by KICD, WII shall furnish a certificate of insurance verifying such coverage.

6.2    Each party shall furnish, and keep in full force and effect at all times during the term of this Agreement, comprehensive general liability insurance including products/completed operations coverage with minimum limits of $ 300,000.00 occurrence and $ 1,000,000.00 aggregate. Each party shall cause its insurance carrier to issue a certificate of insurance to the other confirming this coverage and to give not less than thirty days' advance written notice of cancellation or material change

6.3    Each party shall furnish, and keep in full force and effect at all times during the term of this Agreement, comprehensive automobile liability insurance covering all owned, hired and non-owned automobiles with a minimum limit of $ 1,000,000.00 per occurrence combined single limit bodily injury and property damage liability. Each party shall cause its insurance carrier to issue a certificate of insurance to the other party confirming this coverage and to give not less than thirty days' advance notice of cancellation or material change.


## VII.  Indemnity

7.1    KICD hereby agrees to indemnify, defend and hold WII and its successors and assigns and their respective shareholders, directors, officers and agents harmless from and against any and all liability, expense (including court costs and attorneys' fees) and claims for damage of any nature whatsoever, whether known or unknown and whether direct or indirect, as though expressly set forth and described herein, which WII may incur, suffer, become liable for or which may be asserted or claimed against WII as a result of the acts, errors or omissions, including negligent acts and

4

051705 jeh MANAGEMENT SERVICES AGREEMENT.doc

statutory violations, of KICD.

7.2     WII hereby agrees to indemnify, defend and hold KICD and its successors and assigns and their respective shareholders, directors, officers and agents harmless from and against any and all liability, expense (including court costs and attorneys' fees) and claims for damage of any nature whatsoever, whether known or unknown and whether direct or indirect, as though expressly set forth and described herein, which KICD may incur, suffer, become liable for or which may be asserted or claimed against KICD as a result of the acts, errors or omissions, including negligent acts and statutory violations, of WII.

7.3     KICD and WII expressly agree that the indemnification provisions of this Agreement shall not be limited to claims, expenses, or liabilities for which one of them is solely liable, but shall also apply to claims, expenses and liabilities for which KICD and WII are jointly and concurrently liable. In such event, if either of them advances funds in connection with a claim, expense or liability which is subject to this Section IX in excess of its pro rata share, said party shall be indemnified by the other party hereto for such excess amounts.

## VIII. Arbitration

WII and KICD hereby agree and stipulate that all claims, disputes and other matters in question between WII and KICD arising out of, or relating to this Agreement or the breach thereof will be decided by arbitration in the Washington D.C. metropolitan area, in accordance with the rules of the American Arbitration Association. The award rendered by the arbitrators in such arbitration will be final, and judgment may be entered upon it in any court having jurisdiction thereof.

5

051705 jeh MANAGEMENT SERVICES AGREEMENT.doc

## IX. Assignment

Neither party shall assign this Agreement or its rights and duties hereunder, or any interest herein, without the prior written consent of the other party.

## X. Governing Law

This Agreement shall be construed and governed in accordance with the laws of the Alaska. Subject to the foregoing arbitration provision, the parties hereby consent to the jurisdiction of any state or federal court sitting in the State of Alaska in any proceeding relating to this Agreement and waive any objection to venue in such court. In any arbitration or litigation action or proceeding relating or arising out of this Agreement, the prevailing party shall be reimbursed by the other party for all costs and expenses (including, without limitation, attorneys' fees and costs) incurred in connection with such action or proceeding. The term "prevailing party" shall mean that party whose position is substantially upheld in a final judgment rendered in such arbitration or litigation, or, if the final judgment is appealed, that party whose position is substantially upheld by the decision of the final appellate body to consider the appeal.

## XI. Entire Agreement

This instrument, including the Exhibits attached to it, contains the entire Agreement of the parties as to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements or understandings, whether written or oral, with respect to the subject matter of this Agreement. No amendment or modification to this Agreement shall be valid unless in writing and signed by both parties to the Agreement.

051705 jeh MANAGEMENT SERVICES AGREEMENT.doc

## XII. Notices

All notices, requests and communications provided hereunder shall be in writing, and hand delivered, faxed or mailed and addressed to the party's principal place of business. When available, supplemental notice by Email should be added.

## XIII. Waiver

The waiver by either party hereto of a breach of any term or provision of this Agreement shall not operate or be construed as a waiver of a subsequent breach of the same provision by any party or of a breach of any other term or provision of this Agreement.

## XIV. Miscellaneous

14.1    KICD and WII agree to immediately report to each other in writing all accidents and injuries involving WII's employees assigned to KICD.

14.2    Each party agrees to comply, at its sole cost and expense, with any applicable specific directives promulgated by: (i) a federal, state or local governmental body, department or agency, (ii) an insurance carrier providing coverage affecting this Agreement, and/or (iii) as made necessary by circumstances which currently or specifically affect WII, KICD or WII's employees.

14.3    This Agreement is between WII and KICD and creates no individual or third-party beneficiary rights for the benefit of WII's employees as against KICD or WII.

14.4    WII and WII's workers' compensation insurance carriers shall have the right to inspect KICD's premises, including any job site to which KICD assigns WII's employees. To the extent

051705 jeh MANAGEMENT SERVICES AGREEMENT.doc

7

possible, such inspection shall be scheduled at a mutually convenient time.

  14.5   WII agrees that it comply with all provisions of the Federal Acquisitions Regulations

and the regulations of the U.S. Small Business Administration concerning employment practices and

its Section 8(a) program.

  In witness, the undersigned have executed this Agreement as of the date first written above.

KIC Development, LLC

By: _____

Its: _____

Walton Invesco, Inc.

By: _____

Its: _____

Angelo J. Calfo, WSBA #27079
Andrea D. Ostrovsky, WSBA #37749
CALFO HARRIGAN LEYH & EAKES LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104
Telephone: (206) 623-1700
Facsimile: (206) 623-8717
Email: angeloc@calfoharrigan.com
Email: andreao@calfoharrigan.com

Chester D. Gilmore, AK ID #0405015
CASHION GILMORE LLC
421 W. 1st Ave., Suite 247
Anchorage, AK 99501
Telephone: (907) 222-7934
Facsimile: (907) 222-7938
Email: chester@cashiongilmore.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| KIKIKTAGRUK INUPIAT CORPORATION ("KIC") and KIC DEVELOPMENT ("KICD"), | NO. 3AN-13-6775 CI |
| Plaintiffs, | |
| v. | |
| WALTON INVESCO, INC.; ERNEST C. TREFZ, as Executor of the Estate of Walter Baum; ANTHONY ACRI; and CHRISTINE HAYES, | |
| Defendants. | |

**NOTICE OF FILING EXHIBITS TO COMPLAINT**

Plaintiffs Kikiktagruk Inupiat Corporation ("KIC") and KIC Development ("KICD"), by and through counsel, Calfo Harrigan Leyh & Eakes LLP, and Cashion Gilmore LLC hereby notify the Court and the defendants of the filing of Exhibit A, First Amended Operating Agreement of KIC Development, and Exhibit B, Management Services Agreement, as referenced in the plaintiffs' Complaint.

*Exhibits placed under Complaint 05-02-13 PM (A-B)*

DATED this 1st day of May, 2013.

1

2                           CALFO HARRIGAN LEYH & EAKES LLP

3                                                  ABA 0405015

By _____

4                             Angelo J. Calfo, WSBA #27079

5                             Andrea D. Ostrovsky, WSBA #37749
                               999 Third Avenue, Suite 4400
                             Seattle, WA 98104

6                             Tel: (206) 623-1700
                             Fax: (206) 623-8717

7                             Email: andreao@calfoharrigan.com

8                             CASHION GILMORE LLC

9

By _____

10                            Chester D. Gilmore, AK ID #0405015
                             421 W. 1st Ave., Suite 247
                             Anchorage, AK 99501

11                           Tel: (907) 222-7934
                             Facx: (907) 222-7938

12                           Email: chester@cashiongilmore.com

13                           *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

Angelo J. Calfo, WSBA #27079
Andrea D. Ostrovsky, WSBA #37749
CALFO HARRIGAN LEYH & EAKES LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104
Telephone: (206) 623-1700
Facsimile: (206) 623-8717
Email: angeloc@calfoharrigan.com
Email: andreao@calfoharrigan.com

Chester D. Gilmore, AK ID #0405015
CASHION GILMORE LLC
421 W. 1st Ave., Suite 247
Anchorage, AK 99501
Telephone: (907) 222-7934
Facsimile: (907) 222-7938
Email: chester@cashiongilmore.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

| | |
|---|---|
| KIKIKTAGRUK INUPIAT CORPORATION ("KIC") and KIC DEVELOPMENT ("KICD"), | NO. 3AN-13-06775CI |
| Plaintiffs, | COMPLAINT |
| v. | |
| WALTON INVESCO, INC.; ERNEST C. TREFZ, as Executor of the Estate of Walter Baum; ANTHONY ACRI; and CHRISTINE HAYES, | |
| Defendants. | |

**DEMAND FOR JURY TRIAL**

Plaintiffs Kikiktagruk Inupiat Corporation ("KIC") and KIC Development ("KICD"), by and through counsel, Calfo Harrigan Leyh & Eakes LLP, and Cashion Gilmore LLC hereby demand pursuant to Rule 38(b) of the Alaska Rules of Civil Procedure, that this matter be tried by jury.

DATED this 30 day of April , 2013.

CALFO HARRIGAN LEYH & EAKES LLP

By
    Angelo J. Calfo, WSBA #27079
    Andrea D. Ostrovsky, WSBA #37749
    999 Third Avenue, Suite 4400
    Seattle, WA 98104
    Tel: (206) 623-1700
    Fax: (206) 623-8717
    Email: andreao@calfoharrigan.com

CASHION GILMORE LLC

By
    Chester D. Gilmore, AK ID #0405015
    421 W. 1st Ave., Suite 247
    Anchorage, AK 99501
    Tel: (907) 222-7934
    Facx: (907) 222-7938
    Email: chester@cashiongilmore.com

***Attorneys for Plaintiffs***

IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

KIC and KICD _____ )
                        Plaintiff(s), )
vs.                                   )
                                      )
                                      )
                                      )  CASE NO. 3AN-13-6775 CI
Walton Inveco, Trefz, Acri, Hayes     )
                        Defendant(s). )  SUMMONS AND
                                      )  NOTICE TO BOTH PARTIES
                                      )  OF JUDICIAL ASSIGNMENT

To Defendant: Ernest Trefz as executor of Walter Baum Estate

You are hereby summoned and required to file with the court a written answer to the complaint
which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave.,
Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition,
a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented).
Cashion Gilmore LLC _____, whose address is: 421 w 1st Ave, Suite 247,
Anchorage, AK 99501

If you fail to file your answer within the required time, a default judgment may be entered
against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this
case, in writing, of your current mailing address and any future changes to your mailing address
and telephone number. You may use court form *Notice of Change of Address / Telephone
Number* (TF-955), available at the clerk's office or on the court system's website at
www.courts.alaska.gov/forms.htm, to inform the court. - OR - If you have an attorney, the
attorney must comply with Alaska R. Civ. P. 5(i).

### NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge *Guidi*
   and Master _____.

☐ This case has been assigned to District Court Judge _____.

CLERK OF COURT

04/30/13                                    By: _____
Date                                            Deputy Clerk

I certify that on 04/30/13 a copy of this Summons was  ☐ mailed  ☒ given to
☐ plaintiff  ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order  ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk AD

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If
you have been served with this summons outside the United States, you also have 40 days to file
your answer.

CIV-100 ANCH (6/10)(st.3)                            Civil Rules 4, 5, 12, 42(c), 55
SUMMONS

IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

_KIC and KICD_ )
_____ )
Plaintiff(s), )
vs. )
)
)
_Walton, Trefz, Acri, Hayes_ )  CASE NO. 3AN-_13-6775 cI_
_____ )
Defendant(s). )  SUMMONS AND
) NOTICE TO BOTH PARTIES
) OF JUDICIAL ASSIGNMENT

To Defendant: _Anthony Acri_

You are hereby summoned and required to file with the court a written answer to the complaint
which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave.,
Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition,
a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented)
_Cashion Gilmore LLC_ , whose address is: _421 w 1st Ave, Suite 247_
_Anchorage, AK 99501_

If you fail to file your answer within the required time, a default judgment may be entered
against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this
case, in writing, of your current mailing address and any future changes to your mailing address
and telephone number. You may use court form _Notice of Change of Address / Telephone
Number_ (TF-955), available at the clerk's office or on the court system's website at
www.courts.alaska.gov/forms.htm, to inform the court. - OR - If you have an attorney, the
attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

[X] This case has been assigned to Superior Court Judge _Guidi_
and Master _____.

[ ] This case has been assigned to District Court Judge _____.

CLERK OF COURT

_04/30/13_                                    By: _A. Sachs_
Date                                              Deputy Clerk

I certify that on _04/30/13_ a copy of this Summons was  [ ] mailed  [X] given to
[ ] plaintiff  [X] plaintiff's counsel along with a copy of the
[ ] Domestic Relations Procedural Order  [ ] Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk _AD_

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If
you have been served with this summons outside the United States, you also have 40 days to file
your answer.

CIV-100 ANCH (6/10)(st.3)                                    Civil Rules 4, 5, 12, 42(c), 55
SUMMONS

# IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
## AT ANCHORAGE

_KIC and KICD_

Plaintiff(s),

vs.

_Walton Invesco, Tretz, Aris, Hayes_

Defendant(s).

CASE NO. 3AN- _13-6775 CI_

SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT

To Defendant: _Christine Hayes_

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) _Cashion Gilmore LLC_ , whose address is: _421 w 1st Ave, Suite 247 Anchorage, AK 99501_

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form _Notice of Change of Address / Telephone Number_ (TF-955), available at the clerk's office or on the court system's website at www.courts.alaska.gov/forms.htm, to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

[X] This case has been assigned to Superior Court Judge _Guidi_
and Master _____.

[ ] This case has been assigned to District Court Judge _____.

CLERK OF COURT

_04/30/13_
Date

By: _A. _____
Deputy Clerk

I certify that on _04/30/13_ a copy of this Summons was [ ] mailed [X] given to
[ ] plaintiff [X] plaintiff's counsel along with a copy of the
[ ] Domestic Relations Procedural Order [ ] Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk _AD_

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (6/10)(st.3)
SUMMONS

Civil Rules 4, 5, 12, 42(c), 55

# IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
## AT ANCHORAGE

Kikiktagruk Inupiat Corporation aka KIC

Plaintiff(s),

vs.

Walton Invesco, Ernst Trefz, Acri, Hayes

Defendant(s).

CASE NO. 3AN-13-6775 SC

SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT

To Defendant: Walton Invesco

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) Cashion Gilmore LLC, whose address is: 421 w 1st Ave Suite 247 Anchorage, AK 99501

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at www.courts.alaska.gov/forms.htm, to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge Guidi
and Master _____.

☐ This case has been assigned to District Court Judge _____.

CLERK OF COURT

04/30/13
Date

By: A. _____
Deputy Clerk

I certify that on 04/30/13 a copy of this Summons was ☐ mailed ☒ given to
☐ plaintiff ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk AO

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (6/10)(st.3)
SUMMONS
Civil Rules 4, 5, 12, 42(c), 55